FILED
2011 Jun-23 AM 08:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD EARL PETERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-10-BE-0647-S** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On January 10, 2007, the claimant, Richard Earl Peterson, applied for a period of

disability and disability insurance benefits, in addition to supplemental security income. (R. 41,

42). In both applications, the claimant alleges disability commencing July 8, 2006 because of

coronary artery disease and necrosis of the left hip (premature death of living cells and tissue). *Id*.

Although the claimant had previously been awarded disability benefits, the Commissioner denied

the claims. (R.45, 46, 47-52, 53-58). The claimant filed a timely request for a hearing before an

Administrative Law Judge on May 23, 2007, and the ALJ held a hearing on April 2, 2009. (R. 59,

67). In a decision dated April 16, 2009, the ALJ found that the claimant was not disabled as

defined by the Social Security Act, and thus, was ineligible for period of disability and disability

insurance as well as supplemental security income. (R. 26). On January 25, 2010, the Appeals

Council denied the claimant's request for review, and on March 25, 2010, the Appeals Council

again denied review after considering additional information at the claimant's request. (R. 10-13, 1-4). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 19-26). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses and remands the decision of the Commissioner for further proceedings consistent with this opinion.

## II. ISSUES PRESENTED

The claimant presents the following issue for review: whether the ALJ erroneously failed to obtain testimony from a vocational expert after determining that claimant can perform less than the full range of light work and has nonexertional limitations[1].

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence.

---

[1] The claimant alleges other points of error, but because of the court's disposition on this issue, the court is not obliged to review them.

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently employed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app.1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> "An affirmative answer to any of the above questions leads either to the next question, or on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of 'not disabled.'"

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In determining what work a claimant is able to perform, "[t]he general rule is that . . . the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform." *Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004). However, because "exclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional level *or* when a claimant has nonexertional impairments that significantly limit basic work skills," an ALJ must determine whether a vocational expert's testimony is required. *Id*. (quoting *Francis v. Heckler,* 749 F.2d 1562, 1566 (11th Cir. 1985)).

## V. FACTS

The claimant has twelve years of education, including one year of college, and was 45 years old when the alleged disability began. (R. 31, 25). His past work experience includes employment as a janitor, truck driver, crane operator, and forklift driver. (R. 31, 119-129, 112). The claimant first applied for disability on October 1, 2004 because of avascular necrosis of his left hip. (R. 153-169). In this previous claim of disability, the ALJ retroactively granted claimant a closed-period award of benefits for January 18, 2004 through April 26, 2005 in a decision issued September 1, 2006. (R. 106-109). Shortly after receiving his award, the claimant filed for the disability benefits at issue in this case on January 10, 2007, this time alleging that he was unable to work because of a primary diagnosis of coronary artery disease and a secondary diagnosis of necrosis of the left hip. (R. 41, 42). The claimant alleges an onset of his heart condition on July 8, 2006. (R.33, 41, 42).

### Physical Limitations

Claimant worked as a forklift operator from September 2005 through July 2006. (R. 121,

85). The claimant sets the beginning of his disability on July 8, 2006. (R.111). On July 12, 2006, the claimant was admitted to the emergency room at Carraway Medical Center complaining of chest pain he claimed he had been experiencing for over a month. (R. 175-176). Dr. Wayne Barefield, a family doctor, discharged claimant and referred him to a primary care physician with instructions to resume normal activities. (R.181).

On August 8, 2006, the claimant underwent a coronary angioplasty[2] during a cardiac cathetization performed by Dr. A.M. Reddy, a cardiologist (R. 188). The procedures performed revealed coronary artery disease manifested by approximately 85% stenosis (narrowing) of the left anterior descending (LAD) artery, with the first diagonal branch itself having 90-95% stenosis at its origin of the LAD. Dr. Reddy reported that the residual stenosis was reduced from 85% to 0% after the surgery. (R. 189). He also noted that the right coronary arteries appeared to be normal. (R. 190).

In a follow-up examination on August 14, 2006, Dr. Reddy noted that claimant denied any significant chest pain since the procedure, but continued to have some shortness of breath. Dr. Reddy concluded that all cardiac problems appeared to be stable, and advised the claimant to continue taking his current medications: Plavix (to prevent clotting), Lipitor (to lower cholesterol), and Aspirin. He recommended claimant schedule a follow-up appointment in a month. (R. 192)

On November 24, 2006, the claimant reported to U.A.B. Medical Center complaining of chest pain and shortness of breath. The medical report noted that claimant has been a "half pack a

---

[2]     A procedure used to open clogged arteries involving temporarily inserting and blowing up a tiny balloon where the artery is clogged to help widen the artery.

day smoker for the last 20 years, but has no formal diagnosis of [Chronic Obstructive Pulmonary

Disease] . . ." (R. 193). Dr. Kevin S. Barlotta, an emergency room physician, reported that

claimant was stable and ambulatory, noting specifically that the claimant did not experience chest

pain with ambulation. Two electrocardiograms (EKG) revealed a regular rate and rhythm, and

Dr. Barlotta diagnosed claimant with chest pain, bronchitis, rectal bleeding, and pruritus ani

(itching of rectal area). Dr. Barlotta prescribed hydrocortisone for claimant's pruritus ani and did

not advise claimant to stop taking his Plavix. (R. 194).

On April 14, 2007, Dr. Charles Carnel performed a consultative examination of the

claimant at the request of Disability Determination Services (DDS). The claimant complained of

crushing chest pain, but admitted that after his coronary angioplasty, he had seen decrease in the

frequency of the chest pain. (R. 199-200). Dr. Carnel's report noted that the claimant had a

regular rate and rhythm with no murmurs, and diagnosed claimant with coronary artery disease,

status post stent, and presumed avascular necrosis of the left femoral head, status post total hip

arthroplasty. (R. 201).

A Residual Functional Capacity (RFC) assessment performed by disability specialist

Marcia Jones on May 14, 2007 determined that claimant's exertional limitations included being

able to lift and/or carry up to 20 pounds occasionally, lift and/or carry up to 10 pounds

frequently, stand and/or walk for a total of about 6 hours in an 8 hour workday, and sit with

normal breaks for a total of about 6 hours in an 8-hour workday, noting that the claimant was

limited in the lower extremities to push and/or pull. (R. 205-212). The RFC assessment

stipulated that claimant had various postural impairments, allowing the claimant to only

occasionally climb ramp/stairs, occasionally stoop, occasionally kneel, occasionally crouch, and

occasionally crawl. While the RFC assessment determined that claimant could balance

frequently, the report included a prohibition against climbing ladder/rope/scaffolds. (R. 207). The

report did not establish any manipulative, visual, or communicative limitations, but did include

environmental limitations, recommending claimant avoid concentrated exposure to extreme cold,

extreme heat, humidity, and hazards. (R. 208-209).

On July 17, 2007, claimant was admitted to the U.A.B. Hospital with complaints of chest

pain the claimant rated as 9/10. (R. 246). Dr. William E. Fialkowski, an emergency room

physician, reported that the claimant had a regular rate and rhythm with no murmurs, rubs, or

gallops. A urine drug screen tested positive for cocaine use, which Dr. Fialkowski indicated

could be contributing to claimant's chest pain. The myocardial perfusion imaging done on the

patient showed a normal left ventricle wall motion with a normal ejection fraction of 67%. Dr.

Fialkowski made a final diagnosis of cocaine ingestion, chest pain, and musculoskeletal chest

pain. (R. 247).

On August 28, 2007, the claimant was admitted to the U.A.B. hospital complaining of

chest pain. (R. 234). Dr. Diamond Vrocher, an emergency physician, noted that although the

claimant appeared to be in a lot of pain ("every time he moves he grabs his chest because it

hurts"), the heart rate was regular, without murmur, and the EKG showed normal intervals with

no change from previous EKG reports. Dr. Vrocher discharged the patient, diagnosing him with

chest wall pain and prescribing the claimant with Ultram, a pain reliever. (R. 234-235).

On August 12, 2008, nearly a year later, claimant was admitted to U.A.B. Hospital with

complaints of shortness of breath, chest tightness, and left arm tingling when he unloaded his

truck at work. The claimant reported that while he had previously experienced left arm tingling

with exertion, it was not typically that severe. Despite these symptoms, the claimant denied

having any chest pain. Dr. Ami E. Iskandrian, a cardiologist, noted that the claimant had not been

taking his medications and that claimant's shortness of breath and left arm tingling resolved

when given beta-blockers and nitroglycerin. Claimant was diagnosed with unstable angina,

coronary artery disease, and hypertension. (R. 223). Dr. Iskandrian advised claimant to quit

smoking, and gave him a prescription for nicotine patches. (R. 225).

On September 3, 2008 the claimant was again admitted to U.A.B. Hospital complaining

of chest pressure on the left side. Dr. David C. Pigott and Dr. Lisa Bundy, both emergency

physicians, found that claimant had a regular rate and rhythm, with no murmurs, gallops, or rubs.

(R. 214). An EKG showed benign early repolarization, which was unchanged since the previous

EKG, and claimant's chest x-rays were normal. The Emergency Medicine Report indicated that

the cardiologists who examined the patient "[felt] like his chest pain was noncardiac." The

physicians diagnosed claimant with chest pain, musculoskeletal in nature, headache, history of

epistaxis (nosebleed), and benign early repolarization, and discharged the plaintiff in stable

condition. Dr. Pigott wrote a refill for claimant's prescription for nitroglycerin. (R. 215).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability benefits and

supplemental security income on May 15, 2007, the claimant requested a hearing before an ALJ

on May 23, 2007. (R. 45, 46, 47-58, 59). At the hearing, held on April 2, 2009, the claimant

testified that despite his hip replacement, he still had problems with his hip when he twisted and

bent down to lift objects over 20 pounds, indicating that he could only carry 20 pounds for a few

steps. (R. 67, 31). When not carrying anything at all, the claimant testified that he could walk 25-

30 feet before getting short-winded because of his chest pain. (R. 32). He testified that while

exercise exacerbated his chest pain, he sometimes felt sharp pains in his chest and numbness in

his arms even when he was lying on a couch or bed. Occasionally, the pain would even wake him

from his sleep. (R. 32-33).

During the ALJ hearing, the claimant testified that he had used cocaine at the time of at

least one of his visits to the emergency rooms in 2007. Claimant attributed his use of cocaine to

his battle with pain and inability to get the medication he needed. (R. 33). While he admitted that

he "took the wrong paths," he explained that he had been stressed at the time and, at the time of

the hearing, had not used cocaine in over a year. (R. 33-34). When asked if he had ever seen any

link between his use of cocaine and his chest pain, claimant responded, "No, no, no." (R. 34).

When asked about his ability to work, the claimant testified that he managed to get and

keep a job for about six months in 2008, but that working was "very difficult because the guys

would tease [him] like [he] was lazy and sorry, and didn't want to do anything." The claimant

explained that he did not tell his coworkers that he had undergone a hip replacement surgery and

had had a heart attack "in order for [him] to get a job." "I knew I probably wouldn't have got it if

I said that," claimant admitted. (R. 34).

After "trying to do what [he] could around the guys . . ." the claimant testified that he

asked for his employment to be terminated, "due to [his] injuries," during a company lay off.

When asked whether the claimant would still be employed if the opportunity for lay offs had not

occurred, the claimant testified that he would not. He testified that he frequently had to call in

sick because of pain in his chest or legs. Claimant said that even sitting in an upright chair in the

courtroom to give testimony was causing a tingling sensation in his left arm, wrist, and feet. (R.

34-35).

The claimant testified that now that he is no longer working, he spends most of his time at home lying down, except when he goes to the kitchen to fix himself something to eat or to check on his 70-year-old mother. Although the claimant testified that the heaviest thing he can lift around the house is 15 pounds or less and that he rarely drives, he does not have family members who take care of him. (R. 36).

In recounting his medical history, the claimant testified that he takes nitroglycerine whenever he feels chest pain. He also testified that he takes blood pressure pills and over-the-counter pain medication in addition to the nitroglycerine. When asked about what the doctor he has been seeing says about his heart generally, the claimant responded, "[the doctor] says I'm looking pretty good, you know." Despite the positive medical reports, however, the claimant reiterated that he is still in pain and gets numb when he sits for 35 or 40 minutes at a time. (R. 37). In addition, he testified that if he stands for too long, his left hip begins to experience pain, making numbness and pain his "biggest problem." (R. 38).

Claimant concluded his testimony by talking about how his physical limitations have impacted his family, admitting that the pain he experiences is so bad that he cannot play sports with his children or accompany them on field trips. When asked if he would rather be working if he could, claimant said that he would love to be able to work. (R. 38-39). The claimant was the only witness who testified at the hearing; no vocational expert gave testimony.

*The ALJ's Decision*

On April 16, 2009, the ALJ issued a decision finding the claimant was not disabled under

the Social Security Act. (R. 26). First, the ALJ found that although the claimant had engaged in

substantial gainful activity since the alleged onset of the claimant's disability in July 8, 2006,

because his employment lasted for less than a year, the ALJ allowed the claimant to proceed to

the second part of the five-part test. (R. 21-22). Next, the ALJ found that the claimant had severe

impairments because of his coronary artery disease status post stent placement and necrosis of

the left hip, but concluded that these impairments neither singly nor in combination medically

met or equaled one of the listing impairments. The ALJ relied on the RFC assessment conducted

by Marcia Jones nearly two years earlier on May 15, 2007 in making both of those findings. (R.

22, 212). After examining the progression of the claimant's condition since the RFC assessment,

the ALJ defended his repeated reliance on it by concluding that "[t]he additional evidence

received after State agency review . . . does not include evidence that changes the residual

functional capacity." (R. 25). Although the court does not find that the ALJ erred in not ordering

a new RFC examination, because the court is remanding the case back to the ALJ, and because

now more than four years have passed since the original examination, this court encourages the

ALJ to order a new RFC assessment.

In determining the claimant's residual functional capacity (RFC), the ALJ determined that

the claimant is able to perform "less than the full range of light work." Addressing the claimant's

exertional limitations, the ALJ concluded that the claimant is "limited to lifting and/or carrying

20 pounds occasionally and 10 pounds frequently; standing and/or walking for 6 hours total in an

8 hour work day; and sitting for 6 hours total in an 8 hour work day." In addition to these typical

limitations, the ALJ also imposed another exertional limitation, indicating that the claimant can

"no more than frequently push/pull on the left only." The ALJ also included various postural

limitations that claimant is subject to, concluding that while claimant can "occasionally climb ramp/stairs, [he] should avoid climbing ladder/rope/scaffolds; no more than frequently bend; no more than occasionally stoop, kneel, crouch, and crawl." Finally, the ALJ also imposed various environmental limitations, concluding that claimant "should avoid concentrated exposure to extreme cold, heat, and humidity . . . [and] avoid work environments that require being around hazards, such as, moving machinery and unprotected heights." (R. 22).

In support of this determination of RFC, the ALJ utilized the pain standard, finding that although the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment." In determining that the claimant lacked credibility as to the true extent of his symptoms, the ALJ relied on "significant inconsistencies in the record as a whole." The ALJ cited the claimant's medical record, concluding that the "objective medical evidence is fully consistent with the . . . residual functional capacity and inconsistent with disabling levels of pain and discomfort."(R. 23). In addition to the medical evidence, the ALJ considered the claimant's daily life of independence, finding that his "daily activities are . . . inconsistent with [claimant's] allegations of disabling pain . . . ." The court said that "clinical evidence as a whole indicates [claimant's] sedentary lifestyle is due to his own personal choice and not based on health reasons." Finally the court questioned the claimant's desire to work, citing an "inconsistent report of earnings for some years during the past 15 years, which indicates a lack of motivation to work prior to the alleged onset . . ." of disability. (R. 24). In considering all of this evidence, the ALJ justified his determination of the residual functional

capacity by "[giving] significant weight to the medical source assessments provided by State

agency medical consultants who, after reviewing the record, expressed opinions for less than the

full range of light work." (R.25).

Although the ALJ determined that the claimant is unable to perform any past relevant

work, which consisted of "jobs that require frequent climbing and being around hazardous

machinery, " the ALJ concluded that "considering the claimant's age, education, work

experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform." (R. 25). Relying on the Medical-Vocational

Guidelines, the ALJ found that "[i]f the claimant had the residual functional capacity to perform

the full range of light work . . . a finding of 'not disabled' would be directed by Medical-

Vocational Rule 202.21" (R.26). While the ALJ had previously concluded that the claimant's

RFC allowed him to do "*less* than the full range of light work," the ALJ said that a finding of

"not disabled" was still appropriate because "the additional limitations have little or no effect on

the occupational base of unskilled light work." (R.22, 26) (emphasis added).

## VI. DISCUSSION

The claimant argues that the ALJ erred by failing to provide vocational expert testimony

after finding that claimant's RFC was limited to less than the full range of light work and

included additional nonexertional limitations. This court agrees.

Once the ALJ finds that a claimant cannot perform any of his or her prior work, the

burden of proof shifts to the Commissioner to show other work the claimant can do. *Foote v.*

*Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). Although this burden rests on the Commissioner,

"[b]ecause a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic

obligation to develop a full and fair record. " *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981). Part of this obligation requires the ALJ to develop a full and fair record of the vocational opportunities that are available to the claimant. *Welch v. Bowen*, 854 F.2d 436, 440 (11th Cir. 1988). The ALJ develops a full and fair record of the employment opportunities still available to a claimant "by applying the Medical-Vocational Guidelines (grids) . . . *or* by use of a vocational expert." *Phillips*, 357 F.3d at 1239 (emphasis added).

While exclusive reliance on the Medical-Vocational Guidelines can sufficiently develop the record in some cases, *Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985), "[o]rdinarily, the preferred method of demonstrating that the claimant can perform specific jobs is through the testimony of a vocational expert." *Cowart*, 662 F.2d at 736. Although not every case requires testimony from a vocational expert, "'[e]xclusive reliance on the grids is not appropriate either when claimant is unable to perform a full range of work at a given functional level or when a claimant has nonexertional impairments that significantly limit basic work skills.'" *Walker*, 826 F.2d at 1002-1003 (quoting *Francis v. Heckler*, 749 F.2d 1562, 1566 (11th Cir. 1985)).

The Eleventh Circuit interpreted "full range of employment" as "being able to do 'unlimited' types of work at a given exertional level." *Phillips*, 357 F.3d at 1242 (citing *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981), *overruled on other grounds, Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985)). Because both exertional and nonexertional limitations can affect a claimant's ability to work, "the ALJ should make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations." *Syrock v. Heckler*, 764 F.2d 834, 836 (11th Cir. 1985). In evaluating conclusions made by ALJs about whether an

impairment is severe enough to preclude a wide range of employment, courts are limited to

reviewing only whether the decision is supported by substantial evidence. *Id.* Thus, while the

ALJ may use the grids as a framework for evaluating the vocational opportunities of claimants

with nonexertional limitations, the ALJ "must also introduce independent evidence, preferably

through vocational expert's testimony, of existence of jobs in the national economy that claimant

can perform." *Wolf v. Chater*, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

This case is similar to *Marbury v. Sullivan*, in which the Eleventh Circuit found that the

claimant was not able to do "*unlimited* types of light work, because he was precluded from work

around unprotected heights or dangerous moving machinery." 957 F.2d 837, 839 (11th Cir.

1992). Although the ALJ concluded that this nonexertional limitation was not severe enough to

prevent the claimant from performing a wide range of light work, the Eleventh Circuit held that

such conclusions are "not supported by substantial evidence unless there is testimony from a

vocational expert. *Id*.

Like *Marbury*, the ALJ in the case *sub judice* specifically found that claimant Peterson

was able to perform "less than the full range of light work." In addition to the typical exertional

limitations common to all light work, the ALJ stipulated that claimant "can no more than

frequently push/pull on the left only,"and "should avoid climbing ladder/rope/scaffolds." The

ALJ also imposed nonexertional limitations on claimant, concluding that he can no more than

"occasionally climb ramp/stairs . . . no more than frequently bend; [and] no more than

occasionally stoop, kneel, crouch, and crawl." Finally, the ALJ held that the claimant "should

avoid concentrated exposure to extreme cold, heat, and humidity . . ." and, like the claimant in

*Marbury*, "avoid work environments that require being around hazards, such as, moving

15

machinery and unprotected heights." (R. 22).

Despite imposing these additional exertional and non-exertional limitations, the ALJ simply concluded that they would have "little or no effect on the occupational base of unskilled light work." (R. 26). The ALJ offered no support for this conclusion and failed to specify *any* jobs that claimant could perform. As in *Marbury*, the ALJ's holding that the claimant is not disabled requires the testimony of a vocational expert to be supported by substantial evidence because the ALJ relied on the grids even though claimant could perform less than the full range of light work and even though the claimant had additional exertional and nonexertional impairments. *See Marbury*, 957 F.2d at 839. Without supporting testimony by a vocational expert, or other independent evidence of jobs in the national economy that the claimant could perform, the ALJ in this case did not meet his obligation to fully and fairly develop the record of jobs available to the claimant in substantial numbers in the national economy.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision reach by the ALJ was in error, and is to be REVERSED and REMANDED for further consideration. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 23rd day of June 2011.

_____

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE